Hurst, &c., v. American Association, Limited.

CASE 104—INJUNCTION—MARCH 1.

## Hurst, Etc. v. American Association, Limited.

APPEAL FROM BELL CIRCUIT COURT.

PRINCIPAL AND AGENT—AUTHORITY BY COURSE OF DEALING.—A corporation will not be permitted to repudiate a purchase of land made apparently for it by an agent where it appears that by a uniform course of dealing with the public it had held the agent out to the public as possessing power to buy land and bind the corporation for it.

TINSLEY & FAULKNER, FOR APPELLANT. (J. D. BLACK OF COUNSEL).

Arthur had apparent authority to make the purchase, and uniform dealing is equivalent to actual authority in the absence of actual knowledge on the part of one dealing with him of any limitation on his express authority. 1 Am. & Eng. Ency. of Law, 410; Garrison v. Combs, 7 J. J. M., 85; Mechem on Agency, secs. 282, 283, 707; Com. v. Hawkins, 83 Ky., 246; Kenton Ins. Co. v. Bowman, 84 Ky., 446; Hartford Life & Annuity Ins. Co. v. Hayden's Heirs, 90 Ky., 39; Chemical Nat. Bank of N. Y. v. Wagner, Assignee, 93 Ky., 528.

G. W. SAULSBERRY FOR APPELLEE.

The proof shows that Arthur was acting for the Scottish Middlesborough Land Company and not for the appellee.    Briggs v. Partridge, 64 N. Y., 357; Huntington v. Knox, 7 Cush. (Mass.), 374; Mechem on Agency, sec. 702.

JUDGE BURNAM DELIVERED THE OPINION OF THE COURT.

Plaintiff alleges that it is a foreign corporation organized under the laws of Great Britain; that the sale which

it seeks to enjoin is under an execution which issued against Alex. A. Arthur, trustee, and J. M. Brooks, security, on a sale bond executed by them as purchase-money of a tract of land sold under a decree of the Bell Circuit Court, belonging to the heirs of Robert George; that at this sale, on August 5, 1890, the property was purchased by Fish and Percival, and that these parties failed to comply with the terms of the sale, and afterwards transferred the benefit of their bid to Alex. A. Arthur, trustee, who executed the two bonds as purchase-money for the property, each in the sum of $10,827.25, dated February 5, 1891, and upon one of these bonds the execution sought to be enjoined was issued.

It further alleges that it had no connection with the purchase of this property; that "Alex. A. Arthur, trustee, was not acting for it in any capacity whatsoever with reference to the said lands, but was acting for himself, and for persons other than the plaintiff; . . . that while said Alex. A. Arthur did, from time to time, purchase property with the money of this plaintiff, and take the title to himself in the name of Alex. A. Arthur, trustee, yet the said Alex. A. Arthur was at the same time acting in a similar capacity for divers other corporations and persons, using their money for the purchase of property, and taking the title for their benefit into his own name as Alex. A. Arthur, trustee; and that the said Alex. A. Arthur, at the date of the execution of the bonds, had no right to bind plaintiff by the execution of said sale bonds."

The defendants, by way of answer, allege, in substance, that at the date of the sale of the lands under the decree of the Bell Circuit Court, and at the date of the transfer of the bid of Fish and Percival, Alex. A. Arthur was the general agent of plaintiff in the development of the city

of Middlesborough, and many other enterprises connected therewith; that he made the purchase in question for appellee, and that he had frequently exercised similar powers for plaintiff theretofore, and had been held out by it to the public as having such power and authority, and that appellee was bound by his acts.

It appears from the uncontradicted testimony of Alex. A. Arthur that he was the general manager of the appellee corporation from the fall of 1887 to the winter of 1891, and that he had full power "to buy, sell, and give away land," to make contracts, and generally to perform for appellee, in the United States, the duties and acts commonly performed by a board of directors; that this power was confided to him by the stockholders and board of directors in London, England, when he was first appointed to the position of general manager, and that his authority was never questioned, and that he exercised this general authority for appellee until December, 1891; that appellee corporation desired to own the George lands, and that the board of directors had on two previous occasions directed their purchase, but that he did not buy them, only because the price was too high, but that he considered their ownership so important to the welfare of the company that a short time previously to the execution of the bond in question he again brought the matter of the purchase of this property to the attention of the board of directors at a meeting held in the city of London, England, and that they, after a careful consideration of the matter, directed that H. F. Pollock, the managing director in London, and he (Arthur), should promote the formation of a new company in connection with certain parties in Glasgow, Scotland, to be known as the Scottish Middlesborough Land Company, for the express purpose of purchasing the George lands;

that, after a full and clear understanding with the asso-
.ciation board and with its managing director in London
(Pollock), he (Arthur) instructed the company's local at-
torney, Easton, to purchase the George lands in his name
as trustee, to be held until the organization of the Scottish
Middlesborough Land Company, at which time the prop-
erty was to be turned over, and be finally paid for by the
new company, and that in the meantime he was to make
the first payment on the land; that it was necessary to
have an intermediary in the deal, because the price of the
land was to be added to, so as to embrace the expenses of
the promotion of the Scottish Middlesborough Land Com-
pany, to refund advances made by the American Associa-
tion, to pay fees and cover profits in which others were
interested, and to make provision for the payment to ap-
pellee corporation of the $10,000 which it was to get out of
the deal.

He testifies that it was clearly understood by the direc-
tors of appellee corporation that the purchase was to be
made so as to prevent a loss of the opportunity to acquire
the property, and the directions to Easton to make the
purchase were all made during his absence in London;
and that upon his return to Middlesborough he reported
the whole transaction to Malcolm, the assistant manager,
and Cary, the cashier, of appellee corporation, and to the
attorneys of the company.

This witness testifies that there was no difference
whatever between this deal and other transactions
of a similar character, promoted and carried out
by him in the interest of the association which
were never interfered with or questioned; and that
later, when it became known that the Glasgow company
would not materialize, as general manager of the associa-

tion—after having fully reported the failure of the deal to the chairman, secretary, and board of directors in London, which was done by him personally during his visit there in 1891—he instructed the company's cashier to charge up the obligation to the association, and to enter up the debt in his estimates of requirements for cash for current obligations, which estimate was sent monthly to London; that subsequently, while he was in the exercise of all the powers, rights, and privileges of general manager, he directed the company's local attorney to prepare a declaration of trust for this property, as was his custom in all purchases for the association, which he in due course executed, and directed to be put on record.

None of these statements contained in the deposition of this witness are contradicted by any of the home directors of the company.

Hurst, the commissioner, testifies that Arthur, as general manager of appellee corporation, several years before the purchase of the land in question, requested witness to look up the title to the property, informing him that he wanted to buy it for his company; that he frequently wrote and told him to let him know when the title to the land was perfected, and what it could be bought for; that he did let him know when the suit was pending, and that he employed attorneys of the corporation to keep track of the proceedings, and see that they were regularly taken; that in all these conversations he informed him that he wanted to purchase the property for appellee corporation; that at the time of the sale of the land Arthur was absent in London, but that. Easton, the local attorney of appellee corporation, and the party who had the custody of all its records, attended the sale, and bid on the property, but that it was knocked down to Fish and Percival; that sub-

sequently, when they transferred the benefit of their bid
to Arthur, Easton executed the bonds for the purchase-
money, signing the name of Arthur as trustee; that all
the real estate purchased by appellee corporation in the
neighborhood of Middlesborough was bought by Arthur,
and the bonds for purchase-money always executed in the
name of A. A. Arthur, trustee, exactly as was done in
this case; that he never heard of the Scottish Middlesbor-
ough Land Company, or knew of Arthur making purchases
for any other persons, but that he was the open, notorious
manager and agent of appellee in the promotion of all its
manifold interests around Middlesborough at the date of
the purchase of the George lands.

John M. Brooks, the security on the bond, testifies that
he was the manager of the Middlesborough Town Company,
which was an offshoot of the appellee corporation; that
he signed the bond as security for the purchase of the
George lands at the request of Easton, the local attorney,
with the distinct understanding that he was to become
security for the American Association; that he had never
heard of the Scottish Middlesborough Land Company; that
Arthur, as president of the town company, and manager of
appellee corporation, bought a great deal of property, and
that he always signed his name in the purchase of such
lands as "Alex. A. Arthur, Trustee."

Whilst on the other hand, plaintiff contented it-
self with taking the deposition of Easton, its local
attorney, and the custodian of its papers, who tes-
tifies, in substance, that by the direction of Arthur
he purchased the lands in question, and signed
his name thereto; that it was his understanding that the
purchase was not for the benefit of the company, but that
he made no disclosure of this fact to Hurst, the commis-

sioner, at the time of the purchase. And it appears that the communications addressed to Easton by Arthur in London, relative to the purchase of this land, seems to contemplate that the purchase was to be made for himself and other parties whom he desired to associate with him, and not the corporation. And this testimony is corroborated by that of Mr. Hudgins, the bookkeeper of the company, who testifies that there never was an entry of the purchase of the lands known as the George lands upon the books of the company.

The liability of appellee for the purchase-money of the lands depends—First, upon the question as to whether they were actually bought by Arthur as agent of appellee, with its consent and direction; and, second, if they were not so bought, had he been held out by the corporation to the world as having authority to act for it in such matters, so as to mislead third persons dealing with him on the faith of his official character, even if he acted without the knowledge or consent of the corporation?

It is evident that Arthur exercised in this country very unusual, if not unlimited, power in the management of the affairs of this corporation. He purchased numerous tracts of land for it, executing therefor his obligations as trustee, exactly as was done in this case. By the direction and acquiescence of appellee, he promoted, and was the ostensible head of, numberless enterprises, such as creating towns and villages, constructing railroads, putting on foot manufacturing industries, which involved the expenditure of vast sums of money, which was furnished by appellee, without any apparent limitation of his power to bind or represent it. He was in full, and, so far as the public knew, uncon-

trolled, exercise of these powers at the date of the purchase of the land in question.

It is not claimed that he did not have a general power to transact business for the company in the manner in which this land was bought; in fact, it is admitted in the petition that he was so engaged. Nor is it claimed that those dealing with him in this case had any notice that he was acting for other parties; on the contrary, the evidence of Easton, who signed his name to the obligation in question, testifies that he made no statement to the commissioner as to whom Arthur was buying land for. And whilst it appears that he did occasionally, in an exceptional case, buy land for other parties, and sign his name in the same way, it does not appear that these other parties were known to the public, or that he was held out in any way as their agent. He was the conspicuous and universally recognized manager of all appellee's interests, and his testimony that the board of directors, at a regular meeting in the city of London, approved and authorized the purchase exactly as made, is not contradicted by any of those officers. And, though it is evident that the company did not desire to purchase the property with the purpose of developing the lands itself, yet it is abundantly established that it consented to the purchase by Arthur with a view of selling it, in connection with other property and other parties, to a new corporation, which was to assist in the development of Middlesborough and its various enterprises.

And from another standpoint we think appellee is liable for this purchase.

Mechem, in his work on Agencies (section 282), says: "The authority of the agent, so far as it concerns the rights of third persons, may thus be a

composite matter made up of a number of elements. It consists—First, and primarily, of the powers directly and intentionally conferred by the voluntary act of the principal; second, of those incidental powers which are reasonably necessary and proper to carry into effect the main powers conferred, and which are not known to be prohibited; . . . fourth, of all such powers as the principal has, by his direct act or by negligent omission or acquiescence, caused or permitted persons dealing with the agent reasonably to believe that the principal had conferred." With regard to the liability created by the last subdivision of section 282, the same author says, in section 84: "It may, therefore, be stated as a general rule that whenever a person has held out another as his agent authorized to act for him in a given capacity, or has knowingly and without dissent permitted such other to act as his agent in such capacity, or where his habits and course of dealing have been such as to reasonably warrant the presumption that such other was his agent, authorized to act in that capacity, whether it be in a single transaction or a series of transactions, his authority to such other to act for him in that capacity will be conclusively presumed, so far as it may be necessary to protect the rights of third persons who have relied thereon in good faith and in the exercise of reasonable prudence; and he will not be permitted to deny that such other was his agent, authorized to do the act that he assumed to do, provided that such act is within the real or apparent scope of the presumed authority."

The same rule has been indorsed by Judge Thompson in his commentaries on the Law of Corporations (section 4880), and has been fully sustained by this court in Kenton Insurance Co. v. Bowman, 84 Ky., 446, [1 S. W., 721], where

[ 51 ]

it is said: "The rule seems to be that the executive officer of a corporation, whose duty it is to transact its general business with third persons, is impliedly held out to the world as having authority to act according to the general usage, practice, and course of business of such corporation; and all acts done by him within the scope of such usage, practice, and course of business bind the corporation as to third persons who transact business with him on the faith of his official character, although it may turn out that he acted without the knowledge or consent of the corporation, and against its interest, and in violation of his duty to it."

It is evident, from the proof, that Hurst, the commissioner, who sold the land, and Brooks, the security, who signed the obligation at the request of Easton, the attorney of the company, both thought the purchase was made for the benefit of the association, and, from the manner in which Arthur had been permitted to transact business for the company, they had a right to think so, and appellee was and is bound by his act; wherefore the judgment is reversed, and cause remanded for proceedings consistent with this opinion.